**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| **DOUGLAS GRECO;**<br>**DOUG GRECO FOR AUSTIN MAYOR**;<br>and **RAMON DURAN**,<br><br>        Plaintiffs,<br><br>    v.<br><br>**CITY OF AUSTIN, TEXAS**;<br>**T.C. BROADNAX**, in his official capacity as<br>City Manager for the City of Austin; and<br>**DEBORAH THOMAS**, in her official<br>capacity as Interim City Attorney for the City<br>of Austin<br><br>        Defendants. | CIVIL ACTION NO: 1:24-cv-01061<br><br><br><br>**DECLARATORY AND INJUNCTIVE**<br>**RELIEF SOUGHT** |

## <u>PLAINTIFFS' ORIGINAL COMPLAINT</u>

Plaintiffs file this Complaint for declaratory and permanent injunctive relief, and hereby allege as follows:

### <u>PRELIMINARY STATEMENT</u>

1.  This is a First Amendment challenge to a provision of the Austin City Charter that sets an aggregate limit of $47,000 on contributions that candidates for Austin Mayor or Austin City Council may accept "from sources other than natural persons eligible to vote in a postal zip code completely or partially within the Austin city limits."

2.  Under this aggregate limit, once a campaign has reached the $47,000 threshold, persons who live anywhere other than the favored zip codes, such as Plaintiff Duran, are completely deprived of their First Amendment speech right to participate in the election by making donations to candidates of their choice.

3.      This discriminatory meting out of the right to speak and participate in elections to exclude persons from anywhere other than Austin is not closely drawn to further any permissible government interest and as such is irreconcilable with numerous precedents striking down similar campaign finance restrictions on First Amendment grounds.

4.      In addition to violating the First Amendment, by targeting only the speech of persons who live outside of the City of Austin, the provision violates the Equal Protection Clause of the Fourteenth Amendment.

5.      In discriminating against out-of-Austin donors, Art. III, § 8(A)(3) favors and protects incumbents, the independently wealthy, and those with close connections to the "old Austin" political establishment.

6.      Like most adult residents of Austin, Doug Greco, a candidate for Mayor of Austin, grew up somewhere else and has built relationships beyond Austin in his career.

7.      A native of Mt. Carmel, a working-class town in the coal region of Eastern Pennsylvania, Mr. Greco attended Brown University before moving to Austin in the mid-90s, and beginning in 1997 taught English and Social Studies in East Austin at what was then known as Johnston High School (Now Eastside Early College High School) in the Austin Independent School District. In his three-decade career, Mr. Greco has worked as a community organizer in Austin, a chief of staff to an Austin  representative in the Texas State Legislature, as a senior staff member at the largest statewide LGBTQ civil rights organization in the country, Equality California, and as the Executive Director of the Austin Chapter of the largest national network of non-profit faith and community-based organizations organizing for social change. Along the way he earned graduate Master's degrees from Princeton University and the University of Southern California.

8.      Over this decades-long Austin-centered career, Mr. Greco has built networks and forged alliances and friendships with a wide array of individuals who share his vision for social change and a more progressive Austin, and who wish to support his campaign for Mayor.

9.      It is thus that, in the first reporting period for fundraising in the 2024 Austin mayoral election, Mr. Greco raised more money than any other challenger to the incumbent, relying in part on broad-based grass-roots support that included friends and supporters from Austin, childhood friends and family from the Pennsylvania coal region, classmates from his various degrees, friends who no longer live in Austin, allies and admirers from across the State of Texas with whom he worked in the Legislature, and fellow organizers and advocates for social justice and LGBTQIA+ equality with whom he has worked for decades for social change in Austin, in Texas, and across the country.

10.      One donation at a time, with each donor capped at an individual donation limit of $450, Mr. Greco's broad national network of friends, family, and change-makers contributed up to, or at least very near, the aggregate limit of $47,000 to express their support for his proven record of leadership for social change.

11.      Under Art. III, § 8(A)(3), such donors who happen not to live in Austin but who believe in Mr. Greco's vision for Austin are now entirely precluded from further donating to his campaign.

12.      This total silencing of out-of-Austin individuals from exercising their First Amendment right to support the Greco for Mayor campaign is unconstitutional. It restricts the First Amendment rights of citizens and does not rationally, much less closely or narrowly, advance any legitimate government interest.

13.     Indeed, the primary interest advanced by Art. III, § 8(A)(3) is to violate the equal rights of people who live outside of Austin in order to protect a monopoly on political speech and political power of incumbents, independently wealthy candidates who can self-fund without limits, and the old-money network of Austin insiders.

14.     The regulation has the intended and actual effect of disproportionately favoring candidates like Mr. Greco's opponents in the race for Austin Mayor: an incumbent who has held Austin political office for most of the past three decades; an independently wealthy longtime city-council member with large West Texas oil and gas landholdings; and another candidate from a prominent Austin family with major real-estate development and fracking interests. The incumbent has raised over $750,000 and the other two challengers have each loaned their campaigns substantial amounts of money, which is not subject to any aggregate or individual cap.

15.     The disparate impact and injustice of the City's unconstitutional restraint on out-of-town campaign donations is heightened and exacerbated by the fact that there are no limits on spending by independent PACs under Austin law, and the City does not impose limits on how much an individual can contribute to a PAC. Thus, well-funded and well-heeled candidates are, in practice, allowed to raise and spend virtually unlimited sums in their electoral efforts, while outsider grass-roots candidates like Mr. Greco are disproportionately hamstrung by regulations like Art. III, § 8(A)(3), which directly targets "outsiders."

16.     Art. III, § 8(A)(3) silences, disfavors, and seeks to exclude the majority of Austinites like Mr. Greco who moved here by choice. Moreover, it completely silences and excludes from participation people like Plaintiff Duran and other potential out-of-Austin donors to Mr. Greco's campaign who share and wish to express their support for his vision for the City

through the constitutionally protected means of donating to his campaign, but who happened to wait to make those donations until after the campaign met the aggregate cap.

17.     Although he is supportive of campaign finance regulations that prevent corruption, such as Austin's $450 cap on donations per contributor in each election, Mr. Greco opposes restrictions like Art. III, § 8(A)(3) that discriminate in favor of incumbents and wealthy insiders while completely silencing entire classes of citizens.

18.     Because Art. III, § 8(A)(3) restricts the First Amendment rights of out-of-Austin donors and is neither closely drawn nor narrowly tailored to any legitimate government interest, it is unconstitutional. Plaintiffs file this suit seeking a permanent injunction against its enforcement.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this suit pursuant to 28 U.S.C. §§ 1331 and 1343. This civil action arises under the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983. Plaintiffs seek a declaration of their rights in this case of actual controversy within the Court's jurisdiction pursuant to 28 U.S.C. §§ 2201-02.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b). All Defendants reside in Texas. The City of Austin is located in this judicial district, and the City Manager and City Attorney perform their official duties in this district. In addition, a substantial part of the events giving rise to this claim occurred in this district.

## PARTIES

21.     Plaintiff Douglas ("Doug") Greco is a natural person, a resident of Travis County, Texas, and a candidate for the office of Mayor of Austin.

22.     Plaintiff Doug Greco for Austin Mayor is Mr. Greco's campaign for Austin mayor.

23.     Plaintiff Ramon Duran is a natural person and resident of Bexar County, Texas, postal zip code 78212, who supports Doug Greco's vision for the City of Austin. Mr. Duran donated $250 to Doug Greco for Austin Mayor on March 18, 2024, and wishes to express his support by the constitutionally protected means of engaging in speech and advocacy by donating again.

24.     Defendant City of Austin is a home-rule municipality within the State of Texas.

25.     Defendant T.C. Broadnax, City Manager of the City of Austin, is sued in his official capacity as the chief executive officer of the City.

26.     Defendant Deborah Thomas, Interim City Attorney for the City of Austin, is sued in her official capacity as the officer of the City charged with enforcing the provisions of the City Charter challenged in this lawsuit.

## FACTS

27.     On February 5th, 2024, Doug Greco announced his candidacy for Mayor of Austin. Earlier on the same day he filed his initial campaign paperwork at Austin City Hall, establishing Plaintiff Doug Greco for Austin Mayor.

28.     Campaign fundraising for candidates for Mayor of Austin (as well as candidates for City Council) is regulated by parts of Article III of the City Charter and by the "Austin Fair Campaign Chapter" of the Code of Ordinances.

29.     The Charter includes a base limit of $450 (the current inflation-adjusted amount) on the amount that a candidate may accept per contributor per election.

30.     In the provision challenged in this lawsuit, the Charter limits the total amount that a City candidate may accept in the aggregate "from sources other than natural persons eligible to vote in a postal zip code completely or partially within the Austin city limits." Charter, Art. III, § 8(A)(3). This aggregate limit is adjusted for inflation, and the current limit is $47,000[1] from such sources for a general election campaign and $31,000 in a runoff election, as adjusted in the August 14th budget approved by City Council.

31.     Art. III, § 8(A)(3) was adopted in 1997 in the context of the City of Austin's long and shameful history of wealthy, well-connected, West Austin interests manipulating the City's electoral system to maintain their monopoly on power in City government. Until 2012, the City Council was made up of six at-large council members and a mayor, all of whom were elected in city-wide elections in which each member had to win 50%+1 of the vote for their respective seats. This system allowed the same vested interests to dominate every seat on the Council and frustrated various communities', and particularly minority communities', efforts to gain representation without the support of wealthy local business interests. This system was put in place in 1953 in an express effort to suppress rising Black and Hispanic voting power. Prior to 1953, the Council was elected in a single election in which the top 5 vote-getters in an election won the seats. In 1951, Arthur B. DeWitty, President of the local chapter of the NAACP, finished 6th in the election, falling just a few votes short of election to the Council. Supporters of the 1953 referendum on the change to 50%+1 elections for individual at-large seats publicly

---

[1] The aggregate cap was raised to $47,000 in August 2024 pursuant to the Charter's process for inflation adjustments, but was $46,000 at the time of the July 15, 2024 campaign finance reporting relevant to this case. The $1,000 increase is not material to Plaintiffs' claims.

argued that the change was necessary to prevent Black and Hispanic candidates from being elected to Council. Beginning in the 1970s, as the racially disparate outcomes of this at-large system faced criticism and legal challenges, this 1953 system was perpetuated through a so-called "gentlemen's agreement" under which the wealthy white business establishment agreed not to donate to white candidates for places 5 and 6 on the Council, essentially reserving these seats for one Hispanic and one Black councilmember, so long as the councilmembers in question were amenable to the interests of the white business establishment that remained the chief funders of Austin elections. This feeble simulacrum of representation was invoked to defend the at-large system against numerous legal challenges and repeated attempts to amend the Charter to adopt single-member districts.

32.    Against this historical background, the inclusion of a provision to specifically exclude outsiders in the November 1997 vote to curtail non-Austinites' speech in Austin elections can be understood as an attempt by the entrenched local interests to perpetuate their dominance over local politics.

33.    The 1997 referendum was held, like many local elections in this era, in an "off year," resulting in a low turnout (under 13%) election in which the inherent advantages of the better-funded side were magnified. The vote also occurred in the late-1990s at a time that Austin was experiencing some of the most rapid growth and change in its history as thousands of people (like Mr. Greco) moved here and drove rapid population growth. Austin's population grew by over 40% in the 1990s, and set an all-time City record of 8.1% growth from 1997 to 1998 alone—the exact time frame of the low-turnout election adopting Art. III, § 8(A)(3).

34.    While the November 1997 ballot initiative included some reasonable and constitutional campaign finance limits, the unusual and targeted restriction against donors from

outside the favored zip codes served no purpose other than "keeping outsiders out" and protecting incumbent interests.

35.     Art. III, § 8(A)(3) was thus, from its inception, an effort to beat back the influence of new Austinites and maintain the chokehold on political power that the City's wealthy West Austin business interests had held throughout the 20th Century.

36.     Art. III, § 8(A)(3) and other Austin campaign finance regulations are enforced in part by the Austin Ethics Review Commission, pursuant to the rules and procedures set forth in Austin City Code §§ 2-7-41 – 2-7-50.

37.     On July 15, 2024, Plaintiff Doug Greco for Austin Mayor filed its required semi-annual campaign finance report. In accordance with the law, the report listed each of the donors to Mr. Greco's campaign along with the amounts of their respective donations.

38.     On July 31, 2024, Betsy Greenberg, a donor and supporter of Mr. Greco's rival in the mayoral race Carmen Llanes Pulido and Councilmember and candidate for re-election Council Mackenzie Kelly, filed ethics charges with the City of Austin Ethics Review Commission (on which Ms. Greenberg previously and recently served) alleging that the semi-annual reports of both Doug Greco for Austin Mayor and the campaign committee of incumbent Mayor Kirk Watson had accepted and disclosed donations from out-of-Austin postal zip codes in excess of the then-$46,000 aggregate limit in violation of City Charter Art. III, § 8(A)(3).

39.     On August 28, 2024, the Ethics Review Commission met in open session. At that meeting, it was publicly announced that pursuant to City Code § 2-7-41(H), the Chair of the Ethics Review Commission was scheduling a preliminary hearing regarding the Greenberg complaint for September 25, 2024.

40.     On Friday, September 6, 2024, Assistant City Attorney Caroline Webster sent Mr. Greco a "Notice of Preliminary Hearing before the City of Austin Ethics Review Commission," giving Mr. Greco notice that "On September 25, 2024, ... the City of Austin Ethics Review Commission … will hold a preliminary hearing … on the complaint filed on July 31, 2024 by Betsy Greenberg. … The issue to be addressed at the preliminary hearing will be whether there are reasonable grounds to believe that a violation of a provision within the jurisdiction of the Commission has occurred. Complainant Greenberg has alleged that on June 28, 2024 through the present, Respondent Greco violated City Charter, Article III, Section 8 (A)(3), …."

41.     Under the procedures and rules of City Code §§ 2-7-44, 2-7-45, and 2-7-47, this September 25, 2024 preliminary hearing is the first step in the Ethics Review Commission's enforcement process. If, after a preliminary hearing and a final hearing:

> the Ethics Review Commission determines that a violation of a provision subject to a criminal penalty has occurred, the commission ***shall*** deliver a copy of the commission's findings to the complainant, if any, the respondent, and the city attorney and may recommend prosecution or set forth requirements to be complied with in order that voluntary compliance may be had and final determination obtained." City Code § 2-7-47 (emphasis added).

42.     City Code § 2-7-49 further provides that if the Ethics Review Commission "determines that a violation" of Article III, Section 8 of the City Charter "has probably occurred," it "may recommend that the city attorney prosecute the violation," "request the appointment of a special prosecutor," and/or issue "a letter of admonition, a reprimand, or a letter of censure to a respondent."

43.     Under City Code §§ 2-2-5, "a person who knowingly violates … a provision of City Charter Article III, Section 8 *(Limits on Campaign Contributions and Expenditures)* commits a Class C misdemeanor punishable … by a fine not to exceed $500. Each expenditure, contribution, or other action in violation of this chapter constitutes a separate offense."

44.     While whether any given donor is a person "eligible to vote in a postal zip code completely or partially within the Austin city limits" is not readily ascertainable from the face of a semi-annual campaign finance report through the methodology apparently employed by Ms. Greenberg (seemingly a facile counting of every donation for which a zip code other than an Austin zip code appears in the report),[2] and Plaintiff Doug Greco for Austin Mayor reserves the right to contest in any enforcement action that any given alleged out-of-Austin donation is in fact an in-Austin donation, Plaintiffs do not dispute that the campaign is, at minimum, very near or at the aggregate limit set forth in Art. III, § 8(A)(3).

45.     Plaintiff Duran is a resident of San Antonio who lives in zip code 78212, which is not one of the favored zip codes from which donations are not subject to the $47,000 aggregate cap.

46.     Mr. Duran already contributed $250 on March 18, 2024, and wishes to contribute again, up to the base cap of $450 per contributor.

47.     Mr. Duran is a semi-retired community organizer and does not have any corrupt purpose in his desire to contribute to Mr. Greco, nor does he expect any *quid pro quo*.

48.     To the contrary, Mr. Duran has been a close coworker, mentor, and friend to Mr. Greco for approximately 15 years.

---

[2] For that matter, eligibility to register to vote in one of the favored zip codes is not readily ascertainable from any information campaign committees are required to collect or maintain along with donations, especially considering that both eligibility to vote in general and eligibility to vote in a specific location depend on a number of factors including but not limited to age, criminal history, and the nebulous concepts of "residence" and "domicile" under Texas election law, which are "elastic" and "extremely difficult to define," and which depend on a number of factors including individual voters' subjective volitions and intentions and, given the myriad living circumstance people may have, often come down to the "actual facts and circumstances" of each individual voter's situation. *See e.g. Mills v. Bartlett*, 377 S.W.2d 636, 637 (Tex. 1964); *Del Rio Indep. Sch. Dist. v. Aldrete*, 398 S.W.2d 597, 603 (Tex. Civ. App. – San Antonio 1966, writ dism'd); TEX. ELEC. CODE § 1.015.

49.     Like Mr. Greco, Mr. Duran has worked for virtually his entire career (26 years) as a community organizer working to advance social justice through work with non-profit organizations.

50.     Mr. Duran first met Mr. Greco when Mr. Duran was the lead organizer for the COPS/Metro Alliance in San Antonio ("COPS" stands for "Communities Organized for Public Service"). Mr. Greco worked as a staff organizer for COPS/Metro at the time.

51.     COPS/Metro is a nonprofit organizing project that helps low-income people work with their neighbors to develop strategies to address issues that affect their communities. The mission of the organization includes giving "ordinary people a powerful voice in the decisions that affect their communities."

52.     Although Mr. Duran's career has focused on helping families in the San Antonio region, his organizing and advocacy work has included work for social justice throughout the state, including approximately four years working in Austin as a community organizer with Interfaith Austin along with Mr. Greco. Although he is mostly retired, he still supervises a project in Del Rio, Uvalde, and Bracketville.

53.     Mr. Duran cares passionately about, and has dedicated his life to serving, low-income people and communities throughout the State of Texas, the United States, and the world.

54.     Mr. Duran shares Mr. Greco's vision for the City of Austin and his passion for a more just and inclusive society.

55.     Mr. Duran wishes to exercise his First Amendment right to speak and participate in the mayoral election by making an additional campaign contribution to Doug Greco for Austin Mayor.

56.    Because Doug Greco for Austin Mayor is presently either at or very near the aggregate limit set forth in Art. III, § 8(A)(3) (or even, as alleged in the Greenberg Complaint that the Ethics Review Commission is presently in the process of adjudicating, already beyond the limit), and because a preliminary hearing process is under way alleging that Mr. Greco has been in violation of Art. III, § 8(A)(3) from "June 28, 2024 through the present,"  the Campaign is precluded by the Austin City Charter from accepting  such a further donation from Mr. Duran.

57.    Accordingly, Plaintiff Duran, like every other citizen not eligible to vote in one of the favored zip codes, is presently entirely precluded from exercising his First Amendment right to make a donation for his favored candidate in the Austin mayoral election.

58.    Given that the Ethics Review Commission has begun the process of enforcing Art. III, § 8(A)(3) against the Doug Greco for Austin Mayor campaign, and that that process under the City Code may culminate in an admonition, reprimand, criminal prosecution, and substantial fines, the threat of enforcement against the campaign is an imminent and credible threat of prosecution.

59.    Given that the campaign has accepted out-of-Austin campaign contributions that are alleged by the City to be at the aggregate limit set forth in Art. III, § 8(A)(3) and thus faces potential fines of $500 for every additional donation it accepts from a person not eligible to vote in one of the favored zip codes (each of which donations is capped at $450), the campaign is suffering an ongoing injury in fact from its inability to accept additional contributions from voters not eligible to vote in one of the favored zip codes.

60.    In addition, Plaintiff Doug Greco for Austin Mayor is presently precluded by Art. III, § 8(A)(3) from engaging in fundraising outside of the favored zip codes. Owing to his decades of leadership advocating for LGBTQIA+ equality and other social justice causes, Mr.

Greco has received the endorsement and support of a number of national organizations that advocate for these causes, such as the LGBTQ+ Victory Fund and the Dolores Huerta Action Fund. Art. III, § 8(A)(3) prevents the campaign from exercising its speech and association rights in leveraging these endorsements in further campaign solicitations outside of the favored zip codes.

61.     Plaintiff Duran, who wishes to donate to Doug Greco for Austin Mayor but is presently being prevented from doing so by operation of Art. III, § 8(A)(3), is likewise suffering a present and ongoing injury in the complete deprivation of his well-established First Amendment right to participate in the election by making a donation.

62.     The November 5, 2024 election is less than two months away. Absent the injunctive and declaratory relief sought in this lawsuit, Doug Greco for Austin Mayor will be forced to conduct the remainder of its campaign navigating between the Scylla of constraining its fundraising efforts to entirely exclude a class of citizen donors and the Charybdis of criminal prosecution. Absent the clarification of his rights through the relief sought in this lawsuit, Plaintiff Duran will be entirely and irreparably deprived of his First Amendment right to exercise his speech by donating to Doug Greco for Austin Mayor.

**LEGAL BACKGROUND**

63.     Fortunately for Plaintiffs, the law does not require them either to remain in this limbo nor to sacrifice their Constitutional rights.

64.     Laws that discriminate against campaign donors based on geography are relatively rare, but virtually every court that has considered them has concluded that they violate the Constitution. *See e.g. Thompson v. Hebdon*, 7 F.4th 811, 824–27 (9th Cir. 2021) (striking down an Alaska law setting an aggregate limit on out-of-state contributions in Alaska elections);

*Landell v. Sorrell*, 382 F.3d 91 (2d Cir. 2004), *rev'd on other grounds sub nom. Randall v. Sorrell*, 548 U.S. 230 (2006) (striking down similar regulations of out-of-state contributions in Vermont because there is no evidence that out-of-state donors raise a particular danger of corruption and "the government does not have a permissible interest in disproportionately curtailing the voices of some, while giving others free rein, because it questions the value of what they have to say"); *Van Natta v. Keisling*, 151 F.3d 1215 (9th Cir. 1998) (invalidating an Oregon ballot initiative outlawing contributions from individuals who were not residents of the electoral district for the office the candidate was seeking); *Chancey v. Illinois St. Bd. of Elections*, 635 F. Supp.3d 627, 636 (N.D. Ill. 2022) (issuing preliminary injunction holding that Illinois law prohibiting contributions by out-of-state donors in state judicial elections was likely unconstitutional (later converted to a permanent injunction pursuant to an unopposed motion)); *SD Voice v. Noem*, 380 F. Supp. 3d 939, 948 (D.S.D. 2019) (applying strict scrutiny and permanently enjoining a "total ban on certain out-of-state contributions").[3]

65.     Judicial skepticism of bans or aggregate caps on out-of-state or out-of-district contributions has been particularly uniform since the Supreme Court's decision in *McCutcheon v. FEC*, 572 U.S. 185, 191 (2014), the reasoning of which virtually mandates that aggregate caps on out-of-district donations fail constitutional scrutiny.[4]

---

[3] Even outside of the campaign finance arena, Federal Courts have routinely struck down laws that discriminate against non-resident participation in the political process. See, e.g. *Warren v. Fairfax County*, 196 F.3d 186, 190 (4th Cir.1999) (en banc) (law which precludes non-residents from using public forum violates First Amendment); *Krislov v. Rednour*, 226 F.3d 851, 856 (7th Cir. 2000) (invalidating Illinois law requiring petition circulators to be registered voters residing in the district in part because such laws are "harmful to the unity of our Nation because they penalize and discriminate against candidates who wish to associate with and utilize the speech of non-residents.")

[4] Even aside from its unconstitutional geographic restrictions, Art. III, § 8(A)(3)'s limitation on political participation through campaign donations based on those "eligible to vote" is in deep tension with the Supreme Court's direct precedent in *McConnell v. FEC*, which struck down a

66.     *McCutcheon* reaffirmed the longstanding propositions that "[t]he right to participate in democracy through political contributions is protected by the First Amendment," and lawmakers "may not regulate contributions simply to reduce the amount of money in politics, or to restrict the political participation of some in order to enhance the relative influence of others." *Id.* at 191; *see also Buckley v. Valeo*, 424 U.S. 1, 48-49 (1976) ("the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment.").

67.     Under *McCutcheon*, a government abridgment of the First Amendment right to participate in democracy through political contributions must be "closely drawn" to advance a legitimate government interest while avoiding "unnecessary abridgment of associational freedoms." *McCutcheon*, 572 U.S. at 197 (internal citations omitted).

68.     *McCutcheon* made clear that the **only** permissible government interest that might constitutionally justify limitations on the First Amendment right to participate in the political process through a campaign donation is the prevention of corruption or the appearance of corruption—and specifically "*quid pro quo*" corruption that involves "a direct exchange of an official act for money." *McCutcheon*, 572 U.S. at 191-92 ("**any** regulation **must** instead target what we have called "*quid pro quo*" corruption or its appearance"). The *McCutcheon* Court repeatedly reiterated there was "only one legitimate governmental interest for restricting campaign finances: preventing corruption or the appearance of corruption," and that the Court has "consistently rejected attempts to suppress campaign speech based on other legislative objectives." *Id.* at 206-07.

---

prohibition against minors too young to vote from making campaign donations, noting that despite not being "eligible to vote" "[m]inors enjoy the protection of the First Amendment." 540 U.S. 93, 231-32 (2003).

69.     At issue in *McCutcheon* was an aggregate contribution limit that allowed an individual to contribute the maximum base amount to multiple candidates but not to any additional candidates once the contributor reached his or her aggregate contribution limit. *McCutcheon*, 572 U.S. at 210-18. The Court held that this aggregate limit was a poor fit for combatting *quid pro quo* corruption and thus failed the "closely drawn" test because contributions to a candidate before a contributor has reached the aggregate limit are not less corrupting than contributions to another candidate after the aggregate limit is reached. *Id.*

70.     The *McCutcheon* Court explained that:

> The difficulty is that once the aggregate limits kick in, they ban all contributions of *any* amount. But Congress's selection of a $5,200 base limit indicates its belief that contributions of that amount or less do not create a cognizable risk of corruption. If there is no corruption concern in giving nine candidates up to $5,200 each, it is difficult to understand how a tenth candidate can be regarded as corruptible if given $1,801, and all others corruptible if given a dime.

*Id.* at 210.

71.     Courts applying this reasoning have consistently concluded that various aggregate caps, as opposed to base caps on the amount of each donation, fail to sufficiently relate to and are not closely drawn to the permissible goal of preventing corruption. *See e.g.*, *Catholic Leadership of Tex. v. Reisman*, 764 F.3d 409, 432-34 (5th Cir. 2014).

72.     As the Ninth Circuit recently held, a straightforward application of *McCutcheon*'s principles requires the conclusion that aggregate caps on out-of-state or out-of-district contributions are not "closely drawn" to serve the sole constitutionally permissible government interest of preventing *quid pro quo* corruption or its appearance. *Thompson*, 7 F.4th at 824–27.

73.     The Ninth Circuit in *Thompson*, both before and after the case was remanded on other grounds by the Supreme Court, held that the purported interest in curbing perceived "undue influence" of out-of-state contributors "sa[id] nothing about *corruption*." *Thompson*, 7 F.4th at 824

(emphasis in original). The Ninth Circuit rejected Alaska's proffered interest in "self-governance" as distinct from the permissible interest in preventing corruption but instead "a re-branding of the interest of combating influence and access that the Supreme Court has squarely rejected." *Id.* at 825. The court went on to note that even if the "self-governance" interest could be construed as distinct from the rejected interest in combating influence and access, *McCutcheon*'s clear language that preventing corruption was the only legitimate state interest in capping campaign contributions precluded it from accepting "self-governance" as a new interest justifying such restrictions. *Id.* at 826.

74.     The *Thompson* court also reasoned that even if the state's proffered interests served an anti-corruption purpose, the aggregate cap on out-of-state contributions was not "closely drawn" to serve that interest for the same reasons that the aggregate contribution cap in *McCutcheon* failed the "closely drawn" test. Just as *McCutcheon* reasoned that the aggregate per-contributor contribution limit was a poor fit because contributions before a contributor has reached the limit are not somehow less corrupting than contributions after reaching the limit, so too had Alaska failed to show why an early out-of-state contribution before a candidate had reached the limit was somehow less corrupting than an out-of-state contribution after a candidate had reached the limit. *Thompson*, 7 F.4th at 825.

75.     The exact same reasoning applies to Art. III, § 8(A)(3).

76.     Art. III, § 8(A)(3) plainly restricts the associational freedoms and speech rights of parties like Plaintiffs, whose right "to participate in democracy through political contributions" is restricted, or in the case of Plaintiff Duran entirely defeated, by the aggregate cap on out-of-Austin contributions.

77.     Art. III, § 8(A)(3) is not reasonably aimed at, much less "closely drawn" or "narrowly tailored" to prevent corruption or the appearance of corruption, much less the level of *quid pro quo* corruption involving "a direct exchange of an official act for money."

78.     The City of Austin can offer no constitutionally adequate explanation for how donations by out-of-town donors are somehow more corrupting than donations by donors from Austin.

79.     Nor can the City of Austin offer any constitutionally adequate explanation for how a donation even up to the $450 individual limit is somehow more corrupting after a campaign has reached the aggregate limit than the same contribution made before a campaign has reached the aggregate limit.

80.     Accordingly, like the regulations at issue in *McCutcheon* and *Thompson*, and for the same reasons, Art. III, § 8(A)(3) is unconstitutional.

## **CLAIMS FOR RELIEF**

### **COUNT I:   Freedom of Speech**

81.     Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs as if fully set forth herein.

82.     The First Amendment of the United States Constitution, applicable to the States under the Fourteenth Amendment, protects the rights of both individuals and groups to engage in political speech. Both contributions to political candidates and independent expenditures intended to aid or defeat a candidate constitute protected political speech within the meaning of the First Amendment. Laws restricting political speech implicate core First Amendment freedoms and must be closely drawn to serve a compelling governmental interest.

83.     Art. III, § 8(A)(3) of the Austin City Charter unconstitutionally restricts Plaintiffs' freedom to speak on political issues.

84.     Art. III, § 8(A)(3) constrains the speech of individuals residing outside of the Austin Zip Codes and discriminates against their speech relative to individuals residing within the Austin Zip Codes.

85.     Under Art. III, § 8(A)(3), once a campaign has raised funds that meet the aggregate limit on donations from donors outside the Austin Zip Codes, the Charter acts as a wholesale prohibition on any person residing outside the Austin Zip Codes from participating in the political process for electing a new Mayor. This wholesale restriction on speech beyond the aggregate limit is neither narrowly tailored nor closely drawn to further any legitimate government interest, much less the only permissible government interest allowed under Supreme Court precedent for restricting political speech through campaign donations—the prevention of corruption or the appearance of corruption.

86.     Art. III, § 8(A)(3) is a poor fit for advancing these legitimate interests for the same reasons as the regulations struck down in *McCutcheon v. FEC*, 572 U.S. 185 (2014) and *Thompson v. Hebdon*, 7 F.4th 811, 824–27 (9th Cir. 2021). Namely, there can be no sufficient explanation for why contributions made by persons residing outside of the favored Zip Codes before a campaign has reached the aggregate contribution are somehow less corrupting than contributions made after a candidate has reached that limit.

87.     There is likewise no adequate explanation for why contributions made by persons residing outside of the Austin Zip Codes are more corrupting than contributions made by persons residing within the Austin Zip Codes.

88.     To the contrary, "the government does not have a permissible interest in disproportionately curtailing the voices of some, while giving others free rein, because it questions the value of what they have to say." *Landell v. Sorrell*, 382 F.3d 91 (2d Cir. 2004),

*rev'd on other grounds sub nom. Randall v. Sorrell*, 548 U.S. 230 (2006).

89.     The arbitrary and extreme limitation on protected political speech of Art. III, § 8(A)(3) thus does not further any compelling interest, nor is it narrowly tailored or closely drawn.

90.     Accordingly, Art. III, § 8(A)(3) violates the First Amendment speech rights of individuals and campaign committees.

### COUNT II:  Equal Protection

91.     Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs as if fully set forth herein.

92.     The Equal Protection Clause of the Fourteenth Amendment forbids states (and municipalities) from drawing classifications that impinge upon fundamental rights, including the First Amendment right of free speech, unless the classification is narrowly tailored to serve a compelling government interest.

93.     Art. III, § 8(A)(3) violates the Equal Protection Clause. Art. III, § 8(A)(3) completely prohibits out-of-Austin persons from making political contributions of any amount to a campaign committee that has reached the aggregate limit for donations from persons residing outside of the Austin Zip Codes, while allowing individuals who reside within the Austin Zip Codes to continue making donations unencumbered by any aggregate limit.

94.     Consequently, Art. III, § 8(A)(3) draws a classification that implicates a number of fundamental rights, including freedom of speech, between residents of the Austin Zip Codes and residents of places other than the Austin Zip Codes. This classification is not narrowly tailored to serve any compelling government interest.

95.     The practical effect of Art. III, § 8(A)(3) is to silence individuals who reside outside the Austin Zip Codes from participating in and speaking about the Austin mayoral election while allowing individuals who reside in the Austin Zip Codes to participate without equivalent restraints on their speech.

96.     This discriminatory disparity furthers no compelling government interest and thus violates the Equal Protection Clause.

## COUNT III:  Right of Association

97.     Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs as if fully set forth herein.

98.     The right of association is an implied right guaranteed by the First Amendment's protection of free speech and the right to petition. The First Amendment protects political association, and restrictions on that freedom must be narrowly drawn to avoid an unnecessary abridgment of associational rights.

99.     Art. III, § 8(A)(3) of the Austin City Charter violates the right of association by preventing individuals from making contributions to candidates for Mayor or City Council once the campaign in question has reached the aggregate campaign donation cap. This complete ban on participation through the making of political donations after the aggregate cap has been reached is an unconstitutional elimination of individuals' rights under the First Amendment to associate with each other for the purpose of political speech.

## PERMANENT INJUNCTIVE RELIEF

100.     Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs as if fully set forth herein.

101.    Art. III, § 8(A)(3) has deprived, and will continue to deprive, Plaintiffs of their fundamental rights protected by the First and Fourteenth Amendments. Money damages cannot adequately compensate these constitutional injuries and, absent injunctive relief, the injuries will be irreparable. Accordingly, appropriate injunctive relief and a declaration of the unconstitutionality of Art. III, § 8(A)(3) is necessary.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

(1) Enter Judgment in Plaintiffs' favor;

(2) Declare that Art. III, § 8(A)(3) of the Austin City Charter violates the First and Fourteenth Amendments of the United States Constitution;

(3) Permanently enjoin Defendants from enforcing or giving effect to Art. III, § 8(A)(3) of the Austin City Charter, including from implementing or enforcing its requirements;

(4) Award Plaintiff reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

(5) Grant such other and further relief to Plaintiffs as the Court deems just and equitable.

DATED: September 10, 2024

Respectfully Submitted,

*/s/ Holt Major Lackey*
Holt Major Lackey
Texas Bar No. 24047763
HOLT MAJOR LACKEY, PLLC
111 W. Anderson Ln., Ste. D-211
Austin, TX 78752
Telephone: (512) 949-9598
holt@holtmajorlackey.com

Rebecca Webber
Texas Bar No. 24060805
WEBBER LAW
4228 Threadgill St.
Austin, TX 78723
Telephone: (512) 537-8833
rebecca@rebweblaw.com

**ATTORNEYS FOR PLAINTIFFS**